NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Grafton
No. 2014-0775

CBDA DEVELOPMENT, LLC

v.

TOWN OF THORNTON

Argued: September 16, 2015
Opinion Issued: April 7, 2016

Cronin, Bisson & Zalinsky, P.C., of Manchester (John G. Cronin and Daniel D. Muller, Jr. on the brief, and Mr. Cronin orally), for the plaintiff.

Drummond Woodsum, of Manchester (Matthew R. Serge on the brief and orally), for the defendant.

BASSETT, J. The plaintiff, CBDA Development, LLC (CBDA), appeals an order of the Superior Court (MacLeod, J.) affirming a decision of the Planning Board (Board) of the defendant, Town of Thornton (Town), not to consider CBDA's second site plan application for a proposed recreational campground. Applying the subsequent application doctrine set forth in Fisher v. City of Dover, 120 N.H. 187 (1980), the Board decided that it could not consider CBDA's second application because it did not materially differ in nature and degree from CBDA's initial application. CBDA argues that the trial court erred when it: (1) upheld the Board's decision to apply the Fisher doctrine to applications before a planning board; and (2) found that the Board reasonably

concluded that CBDA's second application did not materially differ from its first application. We affirm.

Fisher involved a challenge to a zoning board's grant of a second variance application. Fisher, 120 N.H. at 188-89. In Fisher, the applicant conceded that in its second application it sought a variance that "was substantially the same as the variance previously requested and ultimately denied by the [zoning] board." Id. at 188. We held that unless "a material change of circumstances affecting the merits of the application" has occurred or the application is "for a use that materially differs in nature and degree from its predecessor, the board of adjustment may not lawfully reach the merits of the petition." Id. at 190. Otherwise, we explained, "there would be no finality to proceedings before the board of adjustment, the integrity of the zoning plan would be threatened, and an undue burden would be placed on property owners seeking to uphold the zoning plan." Id. at 188. Thus, we concluded that the zoning board erred as a matter of law when it reviewed and approved the subsequent application "without first finding either that a material change of circumstances affecting the merits of the application had occurred or that the second application was for a use that materially differed in nature and degree from the use previously applied for and denied by the board." Id. at 191. We have never held that Fisher applies to successive site plan applications before a planning board.

The pertinent facts are as follows. In 2012, CBDA submitted a site plan application to the Board to develop a parcel of land in the Town. The application proposed a campground with approximately 250 campsites, each of which would house a "park model" recreational vehicle with two parking spaces. As described by the Board, the proposed park models were "basically . . . mobile home[s]" that were "meant to be permanent." (Quotations omitted.) CBDA would sell the park models to campers with one-year leases for each campsite, renewable for up to 60 years. The park models required professional removal and could remain on the campsites year-round; nonetheless, the campground would be closed to visitors for several months during the winter and spring. The campground would not accommodate campers who did not own park models.

The Board held several public hearings on the application, during which it expressed concerns about the apparently permanent nature of the proposed campground as evidenced by the mandatory use of park models on each site, the long-term lease agreements, the year-round storage of park models on campsites, and the need for professional removal of the park models. The Board ultimately denied CBDA's application, noting that "the two basic reasons" for the denial were that the campground was "not . . . open to the general public" and that "the initial application presented park model units with a greater amount of permanency than what is intended in the Thornton Campground Regulations and State statutes." In particular, the Board focused

upon the permanence and lack of easy portability of the park model structures, noting that, because the park models required professional removal, they were more similar to permanent dwellings than to campsites. It also emphasized its view that a "campground," as defined in the Town regulations and state statutes, must be a facility where visitors can come and go on a temporary basis. (Quotation omitted.) CBDA's subsequent administrative appeals were denied, and we affirmed.

In 2013, CBDA submitted a second site plan application for the same property. The application proposed a "267 site campground, with associated access roads, onsite septic systems with site hook-ups, community wells and [a] public water system with site hook-ups." The Board held public hearings, during which, citing the Fisher doctrine, it questioned CBDA about the differences between the two applications. The Board noted that it could not consider the merits of CBDA's second application unless "at a minimum the new application [had] changed in such a way that it addresse[d] the reasons for denial [of] the initial application." CBDA explained that, in response to the concerns raised by the Board during CBDA's initial application process, the second application proposed "more campsites, no requirement for a park model to be on every site, no requirement for the park model to be purchased on site from the developer, no long[-]term lease agreement," and "smaller [camp]sites for pop-ups and tents." CBDA also stated that the new application was designed to "capture as much of the transient business" from the public as possible, rather than focusing on use by long-term tenants. When asked whether "the recreational vehicles [would] be stationary on site for the season," CBDA responded that the vehicles could be stored on the campsites when unoccupied, and that there would be "no maximum length of stay."

After comparing CBDA's second application with its prior application, the Board decided that, although the second application addressed the issue of public access to the campground, it did not resolve the Board's concern about the permanent nature of the park models on the campsites. The Board unanimously agreed that it could not review CBDA's second application because the new application did not materially differ in nature and degree from the initial application. See Fisher, 120 N.H. at 190.

CBDA appealed the Board's decision to the trial court by way of writ of certiorari. See DHB v. Town of Pembroke, 152 N.H. 314, 318 (2005) (allowing appellate review by writ of certiorari of planning board's decision not to accept an application). CBDA argued that the Board erred when it refused to consider CBDA's second application "under the subsequent application doctrine" because that doctrine "was created in the context of zoning board appeals" and was not applicable to planning board decisions. Alternatively, CBDA argued that, even if the subsequent application doctrine applied to applications before a planning board, the Board acted unreasonably when it concluded that CBDA's second application did not materially differ from the initial application.

3

The trial court affirmed the Board's decision to apply the subsequent application doctrine to CBDA's second application, observing that the policy goals of Fisher — the finality of proceedings, upholding the integrity of the zoning plan, and protecting the interests of those who rely upon the zoning plan, see Fisher, 120 N.H. at 190 — "are as relevant and critical in the planning board context as they are in zoning board appeals." The trial court also ruled that the Board "reasonably found that [CBDA's] subsequent application was not materially different" from its original application because the subsequent application "did not adequately address [the Board's] explicit concern about the permanency of the campsites in its proposal." This appeal followed.

I

On appeal, CBDA first argues that the subsequent application doctrine does not apply in the planning board context. CBDA argues that the policy rationales underlying our decision in Fisher reflect the particular context of zoning board appeals, and that there are meaningful differences between the zoning and planning contexts. CBDA also argues that, because a planning board is statutorily required to "define through regulation the conditions under which it will accept an application," planning boards can achieve finality in proceedings by adopting regulations that define a "complete application" as one "which satisfies a standard akin to the subsequent application doctrine." Therefore, CBDA argues, the subsequent application doctrine is not needed in this context. The Town counters that the principles underlying our decision in Fisher — particularly that of finality — apply with equal force to planning board decisions, and, therefore, the subsequent application doctrine should apply in this context. The Town also argues that the fact "[t]hat an application is technically complete for regulatory purposes . . . does not affect the applicability of the Fisher doctrine." We agree with the Town.

Superior court review of planning board decisions is limited. Upton v. Town of Hopkinton, 157 N.H. 115, 118 (2008). The appealing party bears the burden of persuading the trial court that, by the balance of probabilities, the board's decision was unreasonable. Id. The review by the superior court is not to determine whether it agrees with the planning board's findings, but to determine whether there is evidence upon which they could have been reasonably based. Id. Our review of the superior court's decision is equally deferential. Upton, 157 N.H. at 118. We will uphold the decision on appeal unless it is unsupported by the evidence or legally erroneous. Id.

Although we have never held that the Fisher doctrine applies to successive site plan applications before a planning board, we agree with the trial court's observation that the policy rationales underlying our decision in Fisher "are as relevant . . . in the planning board context as they are in zoning board appeals." See Fisher, 120 N.H. at 188-90. First, finality is essential to

4

planning board proceedings. Administrative finality "prevents repetitive duplicative applications for the same relief, thereby conserving the resources of the administrative agency and of interested third parties that may intervene." Johnston Ambulatory Surg. Assoc. v. Nolan, 755 A.2d 799, 810 (R.I. 2000); see also Appeal of Town of Seabrook, 163 N.H. 635, 655 (2012) (observing that the subsequent application doctrine is a "similar doctrine" to administrative finality). It also "limits arbitrary and capricious administrative decision-making, while still preserving the ability of an agency to revisit earlier decisions when circumstances have changed." Johnston, 755 A.2d at 810.

Just as zoning boards act in a quasi-judicial capacity when interpreting a zoning ordinance and determining whether to grant a variance, see Taber v. Town of Westmoreland, 140 N.H. 613, 616 (1996), planning boards act in a quasi-judicial manner when approving or denying a site plan application, see Winslow v. Holderness Planning Board, 125 N.H. 262, 267 (1984) (referring to certain actions of a planning board as quasi-judicial). See also Weeks Restaurant Corp. v. City of Dover, 119 N.H. 541, 544 (1979) (noting that "[t]he interests of the parties and the type of issues presented in a site plan review do not differ substantially from those present in the granting of a special exception or a variance" before a zoning board). Thus, allowing applicants to continue submitting substantially similar site plan applications would, just as in zoning board appeals, result in uncertainty about the administrative decision. Accordingly, we conclude that finality is no less important in the planning context than in the zoning context. Cf. Johnston, 755 A.2d at 810 (observing that there "is no inherent reason that the rule [of administrative finality] should not be generally applicable to most areas of administrative regulation").

Moreover, the fact that planning boards must accept for review any "completed" application does not preclude the application of Fisher in the planning board context. As CBDA correctly observes, planning boards are required by statute to "specify by regulation what constitutes a completed application sufficient to invoke jurisdiction to obtain approval." RSA 676:4, I(b) (Supp. 2015). However, determining whether an application is "complete" is an administrative task by which a planning board ensures only that the applicant has provided "sufficient information . . . to allow the board to proceed with consideration and to make an informed decision" as to whether the proposed development satisfies basic requirements. Id.; see Accurate Transp., Inc. v. Town of Derry, 168 N.H. 108, 115 (2015) ("According to the plain language of RSA 676:4, I . . . accepting jurisdiction of a site plan application is merely a procedural prerequisite to a planning board's consideration of the merits of an application." (emphasis added)). In making that determination, the Board here utilizes a "Site Plan Review Checklist," which includes such items as the name of the site plan and whether the site plan includes provisions for snow removal.

In contrast, whether a subsequent site plan application materially differs from a prior application involving the same property is a fact-sensitive inquiry

5

that cannot easily be condensed into a simple checklist.  See Fisher, 120 N.H. at 190-91 ("The determination of whether changed circumstances exist is a question of fact which necessitates a consideration of the circumstances which existed at the time of the prior denial." (quotation omitted)).  Thus, as the trial court observed:

> The fact that planning boards are required by statute to consider "completed" applications does not supersede the interests of finality and judicial efficiency embodied by the Fisher doctrine.  Indeed, it would be a waste of administrative resources for the planning board to repetitiously reconsider an application it had previously denied simply because each time the application submitted contains all materials to be considered "complete" under the planning board's regulations.

As to the two remaining rationales underlying our decision in Fisher — upholding the integrity of the zoning plan and protecting the interests of those relying upon the plan — CBDA argues that, because site plan review "does not concern whether a use is appropriate for a particular parcel of land," subsequent site plan applications do not constitute a threat to the zoning plan.  We disagree.

Although site plan review "does not give the planning board the authority to deny a particular use simply because it does not feel that the proposed use is an appropriate use of the land," Summa Humma Enters. v. Town of Tilton, 151 N.H. 75, 78 (2004) (quotation omitted), we have recognized that site plan review is not merely a "mechanical exercise" of implementing the "specific limitations imposed by ordinances and statutes."  Id. at 79.  Rather, the planning board has the authority to impose conditions upon site plans that are reasonably related to land use goals and other considerations within its purview, including assuring that sites "will be developed in a safe and attractive manner and in a way that will not involve danger or injury to the health, safety, or prosperity of abutting property owners or the general public."  Id. at 78 (quotation omitted).  For instance, in Summa Humma, the plaintiff argued that the planning board lacked the authority to deny a proposal to construct a 90-foot flagpole because there was no controlling statute or zoning ordinance regulating the height of flagpoles.  Id.  We disagreed, holding that, because the planning board had concluded that a flagpole of no more than 50 feet in height was necessary for the "safe and attractive development" of the site, the planning board had the authority to limit the height of the proposed flagpole.  Id. at 78-79 (quotation omitted).

Thus, as Summa Humma makes clear, planning board decisions — like zoning board decisions — affect the development of municipalities.  Indeed, site plan review is designed to ensure that, in "cases where it would not be feasible to set forth in the [zoning] ordinance a set of specific requirements upon which

6

a building inspector could readily grant or refuse a permit," sites are developed in such a way that they "fit into the area in which they are being constructed without causing drainage, traffic, or lighting problems." Id. at 78 (quotations omitted). Thus, just as community members rely upon zoning boards to uphold the integrity of zoning plans, they may reasonably expect planning boards to make decisions that will not negatively affect their properties.

Finally, we note that nothing in our case law restricts Fisher to zoning board decisions. As we have recognized, "[t]he rule in Fisher is consistent with the majority rule that a new application for administrative relief or development permission may be considered by a board if there is a substantial change in the circumstances or the conditions relevant to the application." Brandt Dev. Co. of N.H. v. City of Somersworth, 162 N.H. 553, 556 (2011) (quotation and ellipsis omitted); see 4 E. Ziegler, Jr., Rathkopf's The Law of Zoning and Planning § 68:9 (2012). Accordingly, we hold that the subsequent application doctrine set forth in Fisher applies in the planning board context. Thus, the trial court did not err when it upheld the Board's decision to apply the subsequent application doctrine to determine whether it could properly consider CBDA's second site plan application.

II

CBDA next argues that its second application was materially different from its prior application, and, consequently, the trial court erred by upholding the Board's decision not to consider the merits of the application. CBDA argues that the Fisher doctrine "does not bar subsequent applications in which the applicant makes an effort to address [the] concerns raised [by the Board] with respect to the initial denied application." The Town counters that the Board properly denied CBDA's subsequent application under the Fisher doctrine because it concluded that the modified application did not sufficiently resolve the Board's concerns about the initial application. We agree with the Town.

Applying the Fisher doctrine in this context, an applicant before a planning board bears the burden of demonstrating that a subsequent application "materially differs in nature and degree from its predecessor." Fisher, 120 N.H. at 190. The determination of whether changed circumstances exist is a question of fact. Id. at 190-91. This determination must be made, in the first instance, by the Board. See Hill-Grant Living Trust v. Kearsarge Lighting Precinct, 159 N.H. 529, 536 (2009). On appeal, the board's factual findings are deemed prima facie lawful and reasonable. Morgenstern v. Town of Rye, 147 N.H. 558, 565 (2002). We will uphold the trial court's decision unless it is not supported by the evidence or is legally erroneous. Id.

We have held that Fisher does not preclude consideration of a subsequent application — explicitly or implicitly invited by a zoning board —

7

which has been modified to address the board's concerns about the initial application. Hill-Grant, 159 N.H. at 536. For example, in Morgenstern, we concluded that the trial court erred when it upheld the zoning board of adjustment's (ZBA) conclusion that, under Fisher, it could not consider the plaintiff's second application for a variance. Morgenstern, 147 N.H. at 566. We explained:

> Throughout the litigation in this case, the town has taken the position that it denied the plaintiff's request for a variance because of concerns about the particular proposed structure's impact on the wetlands. Yet, when the plaintiff submitted a new application . . . that allegedly addressed these concerns, the ZBA declined to hear the application on the merits because it concluded that the application did not differ materially from the [original] application.

Id. at 564-65. Thus, we concluded that, "[g]iven the nature of the plaintiff's initial application and the ZBA's reasons for denying the variance," the trial court erred when it upheld the ZBA's refusal to consider the subsequent application because it was submitted "at the town's invitation" and addressed the ZBA's specific concerns "about the proposed structure's impact on the wetlands." Id. at 566.

Similarly, in Hill-Grant we concluded that Fisher did not preclude the consideration of a second application for a variance when the ZBA had expressed that it was willing to consider an application with specific modifications. Hill-Grant, 159 N.H. at 535-37. In that case, the plaintiff sought a permit to build a house at an elevation higher than the zoning ordinance limit of 900 feet. Id. at 531. The ZBA denied the initial request, but stated that, although it would not grant a general variance to build above the proscribed height, if the applicant resubmitted its application with a "specific location" and "certain elevation," the ZBA might grant a variance. Id. at 531, 536 (quotations omitted). We observed that "it is logical to presume that if the ZBA invites submission of a subsequent application modified to meet its concerns, it would find an application so modified to be materially different from its predecessor, thus satisfying Fisher." Id. at 536 (emphasis added). Thus, we concluded that the ZBA could consider the plaintiff's subsequent application to build on its property. Id. at 536-37.

Accordingly, before accepting a subsequent application under the Fisher doctrine, a board must be satisfied that the subsequent application has been modified so as to meaningfully resolve the board's initial concerns. When a board has identified fundamental issues with an application, those issues must be addressed before the board — as well as the interested community members — should be required to invest additional time and resources into considering the merits of the application. An administrative board "should not be required to reconsider an application based on the occurrence of an inconsequential

change, when the board inevitably will reject the application for the same reasons as the initial denial." Brandt, 162 N.H. at 556 (quotation omitted).

Here, the Board reasonably concluded that CBDA's modified application was not "materially different" from CBDA's initial site plan application. Although the Board identified two primary reasons for its denial of the initial application — that the campground was "not . . . open to the general public" and "the initial application presented park model units with a greater amount of permanency than what is intended in the Thornton Campground Regulations and State statutes" — it is clear from the record that the Board's principal concern was the permanency and relative immobility of the proposed park model units. When denying the initial application, the Board noted that the park models were more similar to permanent dwellings than to campsites, and emphasized that a "traditional campground" was occupied on a temporary basis. (Quotation omitted.) When reviewing CBDA's subsequent application, the Board expressed continued concerns about the permanency of the proposed campground. In particular, the Board noted that whether the park model units would be able "to stay year round" was "a critical issue relative to the initial application." The Board also cited CBDA's statement that, despite the changes contained in the new application, 219 campsites could still be occupied by park models, and observed that, given this fact, and because park models "are not generally set up for temporary use," the "temporary occupancy of the campsites ha[d] not been addressed in the second application." The Board noted that if CBDA had prohibited the use of park models on the campsites or limited the time that each campsite could be occupied by a park model, CBDA's proposal would have been materially different because it would have resolved its concern about the permanency of the campsites.

Although under CBDA's second application, it was only possible — rather than certain — that 219 campsites would be occupied by park models, the Board was not, for that reason, required to conclude that the second application was materially different from the first. As CBDA acknowledges on appeal, "the public's preferences will dictate the camping units present on the site as well as [the] length[] of stay during the time when the campground is open." Thus, the principal issue of concern to the Board was not resolved.

Accordingly, we conclude that the record supports the Board's refusal to consider CBDA's second application and that the trial court did not err by affirming the Board's decision. Although CBDA identifies other arguments in its brief, because these issues were not raised in the notice of appeal, the issues were not properly preserved and are deemed waived. See Dupont v. N.H. Real Estate Comm'n, 157 N.H. 658, 662 (2008).

Affirmed.

DALIANIS, C.J., and HICKS, CONBOY, and LYNN, JJ., concurred.

9